FILED
2022 Sep-26  AM 08:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| EARNEST MURRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-00320-NAD |
| | ) | |
| SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER
## AFFIRMING THE DECISION OF THE COMMISSIONER

Pursuant to 42 U.S.C. § 405(g), Plaintiff Earnest Murray filed for review of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") on his claim for disability benefits.  Doc. 1.  Plaintiff Murray applied for disability benefits for a five-month period with an alleged onset date of October 18, 2016.  Doc. 13-4 at 39, 41; Doc. 13-6 at 2, 9; Doc. 13-8 at 2; Doc. 13-3 at 74.  The Commissioner denied Murray's claim for benefits.  Doc. 13-3 at 13–29.

Pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73, the parties consented to magistrate judge jurisdiction.  Doc. 11.  After careful consideration of the parties' submissions, the relevant law, and the record as a whole, the court **AFFIRMS** the Commissioner's decision.

1

## ISSUES FOR REVIEW

In this appeal, Plaintiff Murray argues that the court should reverse the Commissioner's decision for two reasons: (1) the Administrative Law Judge (ALJ) erred in evaluating the opinion of consultative physician Dr. Dallas Russell; and (2) the ALJ erred in evaluating the opinion of treating psychologist Dr. Lindsey Moore. Doc. 19 at 1.

## STATUTORY AND REGULATORY FRAMEWORK

A claimant applying for Social Security benefits bears the burden of proving disability. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To qualify for disability benefits, a claimant must show the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Social Security Administration (SSA) reviews an application for disability benefits in three stages: (1) initial determination, including

reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1)–(4).

When a claim for disability benefits reaches an ALJ as part of the administrative process, the ALJ follows a five-step sequential analysis to determine whether the claimant is disabled. The ALJ must determine the following:

(1)     whether the claimant is engaged in substantial gainful activity;

(2)     if not, whether the claimant has a severe impairment or combination of impairments;

(3)     if so, whether that impairment or combination of impairments meets or equals any "Listing of Impairments" in the Social Security regulations;

(4)     if not, whether the claimant can perform his past relevant work in light of his "residual functional capacity" or "RFC"; and

(5)     if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4); *see Winschel v. Commissioner of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

The Social Security regulations "place a very heavy burden on the claimant to demonstrate both a qualifying disability and an inability to perform past relevant work." *Moore*, 405 F.3d at 1211. At step five of the inquiry, the burden temporarily shifts to the Commissioner "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Washington v. Commissioner of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018)

3

(quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)).    If the Commissioner makes that showing, the burden then shifts back to the claimant to show that he cannot perform those jobs.  *Id.*  So, while the burden temporarily shifts to the Commissioner at step five, the overall burden of proving disability always remains on the claimant.  *Id.*

## STANDARD OF REVIEW

The federal courts have only a limited role in reviewing a plaintiff's claim under the Social Security Act.  The court reviews the Commissioner's decision to determine whether "it is supported by substantial evidence and based upon proper legal standards."  *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).

**A.**    With respect to fact issues, pursuant to 42 U.S.C. § 405(g), the Commissioner's "factual findings are conclusive if supported by 'substantial evidence.'"  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Commissioner of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).

In evaluating whether substantial evidence supports the Commissioner's decision, a district court may not "decide the facts anew, reweigh the evidence," or substitute its own judgment for that of the Commissioner.  *Winschel*, 631 F.3d at 1178 (citation and quotation marks omitted); *see Walden v. Schweiker*, 672 F.2d 835,

838 (11th Cir. 1982) (similar).  If the ALJ's decision is supported by substantial evidence, the court must affirm, "[e]ven if the evidence preponderates against the Commissioner's findings."  *Crawford*, 363 F.3d at 1158 (quoting *Martin*, 894 F.2d at 1529).

But "[t]his does not relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether substantial evidence supports each essential administrative finding."  *Walden*, 672 F.2d at 838 (citing *Strickland v. Harris*, 615 F.2d 1103, 1106 (5th Cir. 1980)); *see Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

**B.**  With respect to legal issues, "[n]o . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims."  *Walker*, 826 F.2d at 999.

## BACKGROUND

### A.    Plaintiff Murray's personal and medical history

Plaintiff Murray was born on September 5, 1972, and was 44 years old at the time that he filed for disability benefits.  Doc. 13-8 at 2.

By January 2013, Murray had been diagnosed with fibromyalgia, adjustment disorder with mixed anxiety and depression, ADHD, depression, low back pain, and knee pain.  Doc. 13-12 at 113. On January 15, 2013, Murray began seeing Dr. Lindsey Moore for psychotherapy for "an adjustment disorder with symptoms of

both depression and anxiety." Doc. 13-12 at 125. Murray arrived early, was "alert, oriented, engaged, and loquacious," had appropriate dress and grooming, "appear[ed] to be experiencing a moderate level of psychological distress," had an anxious mood, and had normal thought processes and generally normal speech. Doc. 13-12 at 125. Murray reported increasing panic attacks. Doc. 13-12 at 126. Dr. Moore noted that Murray was distressed by events in his life, including divorce, financial distress, occupational difficulties, irritability, ADHD, anxiety, and panic attacks. Doc. 13-12 at 126. Murray lacked the desire to leave his home and disliked being in crowded places like grocery stores, but was an active religious leader. Doc. 13-12 at 126.

Through 2014 and 2015, Murray continued to see Dr. Moore for psychotherapy for "an anxiety disorder and adjustment issues." Doc. 13-9 at 196, 222; Doc. 13-10 at 30, 83, 98, 123, 130, 137. Dr. Moore noted that Murray arrived on time or early, was alert, oriented, engaged, and verbose, had appropriate dress and hygiene, typically did not appear to be experiencing distress, had a euthymic mood, and had normal thought process and speech. Doc. 13-9 at 196, 222; Doc. 13-10 at 31, 84, 98, 123, 130, 137. Dr. Moore noted that Murray experienced ADHD and anxiety symptoms and reported distress because of stressful situations in his life and fibromyalgia, but was engaged in activities like volunteering with the Boy Scouts, his faith, nonprofit web designs, and parenting. Doc. 13-9 at 197, 223; Doc.

13-10 at 31, 84, 99, 124, 131, 138.   Dr. Moore diagnosed Murray with anxiety disorder and ADHD, recommended discussing stressors and developing coping skills, and noted that there were no issues requiring urgent intervention.   Doc. 13-9 at 198, 224; Doc. 13-10 at 32, 85, 100, 125, 132, 139.

Multiple times in 2014 and 2015, doctors at the Birmingham, Alabama Veterans Affairs Medical Center (VA Medical Center) noted Murray's diagnosis of fibromyalgia.   Doc. 13-9 at 63, 75, 109.   In April 2015, one of the doctors noted that an aerobic exercise program was "key to management" of Murray's fibromyalgia. Doc. 13-9 at 77.   Murray was prescribed Lyrica for his fibromyalgia.   Doc. 13-9 at 109.   In 2014, Murray also was prescribed medication for his anxiety and depression, including Wellbutrin.   Doc. 13-11 at 147–50.   Multiple times in 2015, Murray saw Dr. Ajmal Khan, a psychiatrist, and reported that his medication was helping; Murray was directed to continue taking Wellbutrin.   Doc. 13-9 at 225, 227; Doc. 13-10 at 79, 81, 104.

On March 31, 2015, Murray had a primary care visit in which he stated that his fibromyalgia was worsening because of stress, that he sometimes could not get out of bed, and that he had problems with concentration and anxiety.   Doc. 13-10 at 107.   On October 13, 2015, Murray reported at a primary care appointment that his fibromyalgia had improved, and that he was going on walks with his wife in the evenings.   Doc. 13-9 at 214.

In December 2015, Murray saw Dr. Celeste Jackson for a primary care appointment because of worsening fibromyalgia symptoms that were causing pain and limiting his mobility.  Doc. 13-9 at 203–05.

In January 2016, Murray saw Dr. Khan for adjustment disorder.  Doc. 13-9 at 192.  Murray told Dr. Khan that medication was helping his depressive symptoms.  Doc. 13-9 at 192.  Murray was directed to continue taking Wellbutrin and to continue attending therapy.  Doc. 13-9 at 192–94.

Throughout early 2016, Murray continued seeing Dr. Moore for psychotherapy.  Doc. 13-9 at 162, 175, 181, 185, 189.  Murray typically arrived on time or early to his appointments, was alert, oriented, engaged, and verbose, had appropriate dress and grooming, maintained good eye contact, had normal thought processes and speech, and had moods ranging from euthymic to mildly anxious or dysphoric.  Doc. 13-9 at 162, 175, 181, 185, 189.  Dr. Moore consistently noted that Murray had ADHD and anxiety symptoms, had a worsening mood likely due to fibromyalgia, and was distressed by stressful situations in his life; however, Dr. Moore noted that Murray was involved with activities like the Boy Scouts, active in his faith and nonprofit web designs, and devoted to parenting.  Doc. 13-9 at 163–64, 176, 182, 186, 190.  Dr. Moore proposed a treatment plan that involved discussing stressors and developing coping skills.  Doc. 13-9 at 164, 177, 183, 187, 191.  Dr. Moore did not note any issues requiring urgent intervention.  Doc. 13-9 at 164, 177,

183, 187, 191.

On May 9, 2016, Dr. Moore wrote a letter about Murray's status.  Doc. 13-9 at 160.  Dr. Moore stated that Murray had been seeing her since 2013, and had been receiving treatment at the VA Medical Center for mental health concerns since 2005.  Doc. 13-9 at 160.  Dr. Moore stated that Murray suffered from anxiety disorder and ADHD, such that he experienced "marked interference with excessive worry, sensations of panic, concentration, sleep disturbance, fatigue, irritability, and motivation."  Doc. 13-9 at 160.  Dr. Moore also noted that Murray suffered from fibromyalgia, which was "believed to share a cyclical relationship with anxiety and depression."  Doc. 13-9 at 160.  Dr. Moore stated that, "taken together, it would be reasonable to expect that, when symptoms associated with these disorders are heightened, Mr. Murray may experience diminished ability to perform typical duties and responsibilities associated with traditional employment."  Doc. 13-9 at 160.  Dr. Moore also stated that, despite treatment, Murray had not experienced "much improvement in his overall mental health status."  Doc. 13-9 at 160.

In May, June, July, and August 2016, Murray continued to see Dr. Moore for psychotherapy sessions.  Doc. 13-9 at 140, 149, 153, 157.  Murray's general presentation at his sessions with Dr. Moore remained consistent.  Doc. 13-9 at 140, 149, 153, 157.  Murray reported many stressors in his life, including child custody matters.  Doc. 13-9 at 141, 150, 154, 158.  Dr. Moore stated that Murray was dealing

with ADHD and anxiety symptoms and with a worsening mood, likely due to stress, but remained active in his faith, nonprofit web designs, and parenting.  Doc. 13-9 at 141, 150, 154, 158.

On August 18, 2016, Murray presented to the VA Medical Center complaining of pain in his right shoulder that was radiating to his chest and sometimes causing "popping" of his breastbone.  Doc. 13-9 at 127.  He stated that in 2012 he injured his shoulder while moving furniture.  Doc. 13-9 at 127.  Treatment notes indicated decreased handgrip.  Doc. 13-9 at 127.  Imaging of Murray's right shoulder identified mild degenerative changes and a possible "tiny bone island" in the humeral head.  Doc. 13-9 at 2.  At the same time, imaging of Murray's upper back identified only "minimal degenerative change."  Doc. 13-9 at 3.

In September 2016, Murray filled out a disability report, stating that he suffered from attention deficit disorder, clinical depression, anxiety, fibromyalgia, knee problems, shoulder problems, back problems, obesity, acid reflux, and hearing problems/tinnitus, and that he had stopped working in August 2012 because of his conditions.  Doc. 13-8 at 6–7.  Murray previously had worked in computer tech, social media direction, and graphic design.  Doc. 13-8 at 7.  Murray reported that, on a typical day, he would dress, eat breakfast, take a shower, watch television, "do light housework if feeling ok," possibly play video games, eat lunch, watch more television or play more games, eat dinner, and watch more television before going

10

to bed.  Doc. 13-8 at 24.  Murray stated that he sometimes needed his wife to remind him to refill his medications, but that he made his own meals daily and could do chores including cleaning, laundry, dishes, and vacuuming, if he was not "hurting and feeling bad."  Doc. 13-8 at 26.  Murray stated that he was able to drive or ride in a car, and that he went shopping for groceries every other week as long as he did not have a panic attack.  Doc. 13-8 at 27.  Murray stated that he could not sit at the computer for more than an hour.  Doc. 13-8 at 28.  He also stated that he participated in the Boy Scouts for an hour per week unless he felt too bad and had to cancel.  Doc. 13-8 at 28.  Murray stated that his conditions affected his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember, concentrate, understand, and use his hands.  Doc. 13-8 at 29.  Murray stated that he could pay attention for about an hour to an hour and a half, that he could follow written instructions very well, and that he sometimes was bad at following spoken instructions if the person spoke quietly or if he was having a bad day and became confused.  Doc. 13-8 at 29.

On September 20, 2016, Murray went to the VA Medical Center for a primary care visit due to knee and shoulder pain.  Doc. 13-9 at 118.  Dr. Nidhi Bansal noted that Murray suffered from conditions including shoulder pain, back pain, depressive disorder, ADHD, anxiety, and fibromyalgia.  Doc. 13-9 at 118.  Murray had a body mass index (BMI) of 33.7.  Doc. 13-9 at 119.

Also on September 20, 2016, Murray returned to Dr. Moore for psychotherapy.  Doc. 13-9 at 123.  Murray's session was consistent with previous sessions, and he presented normally, but his mood was dysphoric.  Doc. 13-9 at 123. Murray told Dr. Moore that he had been dealing with stressful events that were causing him to feel distressed and affecting his sleep.  Doc. 13-9 at 124.  Dr. Moore encouraged Murray to maintain a daily routine and to increase his movement and exercise.  Doc. 13-9 at 124.  Dr. Moore observed that Murray was suffering from ADHD and anxiety symptoms along with a worsening mood potentially caused by fibromyalgia and stress, but that he remained active in his faith, nonprofit web designs, and parenting.  Doc. 13-9 at 124.

On September 26, 2016, Murray underwent occupational therapy for pain in his right shoulder at an intensity of 6-7 out of 10.  Doc. 13-9 at 49.  Murray was alert and well oriented to person, place, time, and situation; he also followed directions. Doc. 13-9 at 49.  His treatment plan included hot and cold packs, therapeutic exercises, and a home plan to help him perform normal daily activities and increase his range of motion.  Doc. 13-9 at 50.

On October 6, 2016, Murray presented at a primary care appointment with shoulder pain.  Doc. 13-12 at 169–70.  Murray stated that his pain had worsened and was made worse with movement, though he had not lost any strength.  Doc. 13-12 at 170.  Murray would not lift his arm over his head due to pain, but he said that he

could lift his arm overhead while dressing.  Doc. 13-12 at 170.

On October 3, 2016, Murray's wife submitted a third-party function report. Doc. 13-8 at 32.  She stated that Murray usually just watched television, played computer games, made dinner over the course of a day, and sometimes did household chores.  Doc. 13-8 at 32–39.

On October 18, 2016, Murray saw Dr. Mustafa Akif for a primary care appointment.  Doc. 13-12 at 160.  Murray reported chronic pain in his back and shoulder, as well as fatigue.  Doc. 13-12 at 160.  Dr. Akif noted that Murray had a history that included shoulder pain, back pain, depressive disorder, ADHD, adjustment disorder, anxiety, fibromyalgia, knee pain, and low back pain.  Doc. 13-12 at 160.

On October 28, 2016, Murray returned to Dr. Moore for psychotherapy.  Doc. 13-12 at 153.  His session was largely consistent with previous sessions; Murray presented normally, but appeared to be experiencing "mild psychological distress" and had a dysphoric mood.  Doc. 13-12 at 153.  Murray reported being distressed by circumstances in his life, including legal matters, financial strain, fibromyalgia, and anxiety, and reported that stressors had caused his mood to worsen.  Doc. 13-12 at 154.  Dr. Moore encouraged routine and exercise.  Doc. 13-12 at 154.  Dr. Moore stated that Murray was suffering from ADHD and anxiety symptoms, worsening mood, anxiety, depression, and panic attacks, but that he still was active in his faith,

nonprofit web designs, and parenting.  Doc. 13-12 at 154.

On December 6, 2016, Dr. Dallas Russell filled out a consultative report related to Murray's disability proceedings.  Doc. 13-12 at 181.  Dr. Russell noted that Murray had mostly normal range of motion, except for reduced flexion and extension in his dorsolumbar spine, reduced flexion in his knees, and reduced abduction, adduction, and forward elevation in his shoulders (especially his right shoulder).  Doc. 13-12 at 181–82.  Dr. Russell noted that Murray's dexterity and grip strength were normal.  Doc. 13-12 at 182.  Dr. Russell stated that Murray had multiple issues, but that the most problematic issue was fibromyalgia, which affected his shoulders, arms, neck, and chest regions, and "the legs to some degree," and could sometimes leave him "almost bed-bound."  Doc. 13-12 at 183.  Dr. Russell stated that Murray had tender points and had pain at an intensity of 9 out of 10 when he had flare-ups.  Doc. 13-12 at 183.  Dr. Russell observed that Murray had lower back pain that was worse with movement and caused him to have to shift when sitting, and also had shoulder pain and limited range of motion in both shoulders (especially the right).  Doc. 13-12 at 183.  Dr. Russell noted "left knee difficulties" and pain, as well as chest pain.  Doc. 13-12 at 183–84.  Dr. Russell observed that Murray had tinnitus that caused him difficulty hearing female voices, had mild headaches, and had panic attacks, anxiety, and depression.  Doc. 13-12 at 184.  Dr. Russell stated that Murray avoided lifting, had difficulties walking, could have

14

trouble standing for long periods of time, and had to shift positions when sitting. Doc. 13-12 at 184.

Dr. Russell noted that Murray was 5'8" tall and weighed 215 pounds. Doc. 13-12 at 185. Murray's behavior and appearance were normal. Doc. 13-12 at 185. Murray had multiple tender points but no edema of the extremities and no trouble getting on and off the exam table; his gait was normal, and he could squat and walk on his heels and toes. Doc. 13-12 at 185–86. Murray had normal grip strength, normal fine and gross manipulation, normal fine motor skills, and normal handling, fingering, gripping, and feeling. Doc. 13-12 at 186. Dr. Russell noted that Murray's overhead and forward reaching were abnormal. Doc. 13-12 at 186. He stated that Murray's vision, hearing, and speech were unremarkable, and that Murray would be "sensitive to environmental exposures such as heat/cold/humidity/noise/vibration." Doc. 13-12 at 186. Dr. Russell noted that Murray would have "difficulty" with carrying and lifting and pushing and pulling, and that "there is difficulty" with sitting, standing, and walking. Doc. 13-12 at 186. Dr. Russell noted that Murray had fibromyalgia with tender points and "fibromyalgia fog where at times he has trouble coming up with words." Doc. 13-12 at 186.

In February, March, April, and May 2017, Murray had appointments with Dr. Moore for psychotherapy. Doc. 13-14 at 16, 22, 46, 55. He presented on time and normally, and Dr. Moore noted that Murray did not appear to be experiencing

15

distress and had a euthymic mood and affect.  Doc. 13-14 at 16, 22, 46, 55.  Murray continued to report distress from stressors in his life, but stated that there was some improvement in his mood.  Doc. 13-14 at 17, 23, 47, 56.  He was involved in the Masons, the Boy Scouts, his faith, nonprofit web designs, and parenting.  Doc. 13-14 at 17, 23, 47–48, 56.

Also in March 2017, Murray had a psychiatric appointment in which he stated that he was doing "fine" despite stressors in his life.  Doc. 13-14 at 49–50.

On June 2, 2017, Murray saw Dr. Yolanda Brown Bowie, a rheumatologist.  Doc. 13-14 at 10.  Dr. Bowie confirmed that Murray's condition was consistent with fibromyalgia.  Doc. 13-14 at 14.  Murray was advised to continue taking medication including Lyrica and to attempt physical therapy, acupuncture, or exercise.  Doc. 13-14 at 15.

On June 19, 2017, Murray saw psychiatrist Dr. Jaria Chowdhury, who noted that Murray's fibromyalgia had been worsening and had become severe enough to "inhibit functionality."  Doc. 13-13 at 197–98.  Murray stated that he was stable overall in his mental health.  Doc. 13-13 at 198.  Also on June 19, 2017, Murray saw Dr. Moore for psychotherapy.  Doc. 13-13 at 204.  Dr. Moore noted that Murray presented normally and had euthymic mood and affect, though he continued to report distress from stressors in his life.  Doc. 13-13 at 204–6.

In July 2017, Murray again saw Dr. Moore for psychotherapy.  Doc. 13-13 at

192.  He arrived on time, was alert, oriented, engaged, and verbose, had normal appearance and behavior, and presented with euthymic mood and affect.  Doc. 13-13 at 192–93.  Murray continued to be distressed by stressors in his life, but was involved in the Boy Scouts and the Masons and had recently been promoted to "Master Mason" and voted an officer.  Doc. 13-13 at 193–94.  Dr. Moore noted that testing indicated moderately severe depression.  Doc. 13-13 at 194.

In September 2017, Murray saw his psychiatrist, Dr. Khan, and reported that he was "doing okay."  Doc. 13-13 at 87.  Murray was generally concerned about his health, including his fibromyalgia and back problems, but overall felt "okay" and stated that acupuncture had helped his pain.  Doc. 13-13 at 87.

In September and October 2017, Murray saw Dr. Moore for psychotherapy. Doc. 13-13 at 83, 92.  Murray's sessions were consistent with previous sessions; he did not appear to be experiencing significant distress and had an unremarkable mood and affect.  Doc. 13-13 at 84, 92.  He reported distress from externally stressful situations, but continued to enjoy participating in the Masons, the Boy Scouts, his faith, web design, and parenting.  Doc. 13-13 at 85, 93–94.  Murray had similar sessions with Dr. Moore in November and December 2017, but had a depressed mood and affect.  Doc. 13-13 at 58, 79.

On December 19, 2017, Murray saw Dr. Khan and stated that he was "mostly okay."  Doc. 13-13 at 54.  Murray reported that his mood had been mostly stable and

he had been sleeping and eating well, but that he had pain issues due to fibromyalgia. Doc. 13-13 at 54. Murray saw Dr. Khan again in March 2018, and reported that he felt "okay I guess." Doc. 13-15 at 148. Murray reported that his mood had been stable but he was concerned about worsening fibromyalgia. Doc. 13-15 at 148. Murray also reported that he had experienced a panic attack when he went to a Saint Patrick's Day parade. Doc. 13-15 at 148.

Throughout 2018, Murray continued to see Dr. Moore for therapy. Doc. 13-15 at 123, 144, 153, 177; Doc. 13-16 at 68. Murray presented normally but at times displayed a "(mildly) depressed" mood with congruent affect. Doc. 13-15 at 152–53, 177. Murray was distressed by external stressors and an increase in pain due to fibromyalgia, which also caused increased fatigue and decreased motivation. Doc. 13-15 at 123–24, 144, 154, 177–78; Doc. 13-16 at 68. However, Murray "maintained a busy schedule with multiple activities and meetings" despite "poor energy level, pain, and fatigue." Doc. 13-15 at 125, 145, 154, 178; Doc. 13-16 at 70. Dr. Moore noted that Murray's mood seemed to be worsening, likely due to fibromyalgia, but that he remained involved in the Boy Scouts, the Masons, his church, web design, and parenting. Doc. 13-15 at 125, 145, 154, 178; Doc. 13-16 at 70.

On June 20, 2018, Murray saw Dr. Muhammad Ali for a primary care visit. Doc. 13-15 at 63. Dr. Ali noted that Murray was suffering from fibromyalgia,

arthritis of the shoulders, anxiety and stress, and atypical chest pain.  Doc. 13-15 at 64.  Murray had decreased range of motion in his shoulders and an antalgic gait.  Doc. 13-15 at 66.  Dr. Ali described Murray as "alert, oriented, pleasant and cooperative."  Doc. 13-15 at 66.  Also in June 2018, Murray agreed to try tai chi to potentially help his fibromyalgia.  Doc. 13-15 at 78.

On June 21, 2018, Murray saw his psychiatrist Dr. Khan and reported that he had been feeling "up and down."  Doc. 13-16 at 72.  Murray had recently gone on vacation and reported that his condition had been stable.  Doc. 13-16 at 62.

On June 25, 2018, Dr. Moore, Murray's psychotherapist, submitted a letter on Murray's behalf regarding his condition.  Doc. 13-16 at 79.  The letter repeated verbatim her statement from 2016.  Doc. 13-16 at 79; *see* Doc. 13-9 at 160.

Throughout the rest of 2018 and into 2019, Murray continued to see Dr. Moore for psychotherapy; Dr. Moore's treatment notes remained materially consistent with the previous notes from Murray's treatment.  *See, e.g.*, Doc. 13-16 at 121, 169, 164; Doc. 13-19 at 3, 24, 61, 67, 77, 88, 105, 141; Doc. 13-20 at 35, 80.

## B.    Social Security proceedings

### 1.    Initial application and denial of benefits

In September 2016, Murray filed an application for disability insurance benefits, alleging a disability onset date of July 24, 2014.  Doc. 13-4 at 39, 41; Doc. 13-6 at 2, 9; Doc. 13-8 at 2.  Murray alleged that he suffered from attention deficit

disorder, clinical depression, anxiety, fibromyalgia, knee problems, shoulder problems, back problems, obesity, acid reflux, and hearing problems/tinnitus.  Doc. 13-8 at 42.

In December 2016, Murray's claim for disability benefits was initially denied because, based on the evidence presented, Murray did not qualify as disabled.  Doc. 13-5 at 4–9; Doc. 13-8 at 41–55.  Stephen Dobbs, PhD, opined that Murray had only mild restrictions and difficulties based on his mental disorders, which did not support a finding of disability.  Doc. 13-8 at 46–48.  Dr. Scott Touger, a non-examining state agency physician, opined that Murray had some limitations but could perform light work.  Doc. 13-8 at 49–56.

Murray requested a hearing before an ALJ.  Doc. 13-5 at 10.

### 2.   2018 ALJ hearing

On August 29, 2018, an ALJ conducted an in-person hearing to determine whether Murray was disabled.  Doc. 13-3 at 70–72.  Murray stated on the record that he was amending his alleged disability onset date to October 18, 2016.  Doc. 13-3 at 74.

Murray testified that his wife drove him to the hearing, but that he could drive "on and off."  Doc. 13-3 at 75.  Murray stated that he was in the Navy from 1991 to 2001, and that he had not worked at all since October 18, 2016 (his alleged disability onset date).  Doc. 13-3 at 76.  Murray testified that, during the relevant time period,

he had worsening fibromyalgia and arthritis, as well as anxiety and depression. Doc. 13-3 at 77. Murray testified that he had been seeing his psychologist, Dr. Moore, for 4 or 5 years, and that Dr. Moore managed his conditions with therapy and medication and "mostly stress management" because his fibromyalgia worsens with stress. Doc. 13-3 at 77. Murray testified that his fibromyalgia caused pain, loss of grip, and forgetfulness because of "fibro fog." Doc. 13-3 at 78.

Murray testified that he did chores around the house, including helping with the dishes and laundry, but that, when he tried to "do too much, [he would be] paying for it for two or three days later." Doc. 13-3 at 79. Murray testified that he did an "experiment" to see if he could work on a computer all day, and the first day he did well, but then it took him two days to recuperate. Doc. 13-3 at 80. He testified that he previously had been an assistant scout master for the Boy Scouts, but that he did not "go in the field at all anymore" and just went to meetings. Doc. 13-3 at 81. Murray testified that he could only walk short distances and had trouble with stairs and uneven surfaces. Doc. 13-3 at 83–84. Murray testified that on a typical day he woke up around 8:00 AM, ate breakfast, and—depending on how he felt—would do chores around the house like wash dishes; or, if he were having a "bad day," he would be "lucky to get out of bed." Doc. 13-3 at 86, 92. He testified that he could only lift about 10 pounds. Doc. 13-3 at 87. He testified that going to Walmart sometimes caused him to have an anxiety attack. Doc. 13-3 at 88. He testified that

his fibromyalgia makes him sensitive to his environment.  Doc. 13-3 at 89–90.

Murray testified that he was part of the Masons and went to the lodge once or twice

a month, that he went to Boy Scouts meetings about once a month, and that he played

video games with friends for about an hour at a time.  Doc. 13-3 at 91–92.  Murray

testified that he sometimes took his son to the art museum or movie theater.  Doc.

13-3 at 94.

### 3.    2018 ALJ decision

On November 21, 2018, the ALJ entered an unfavorable decision on Murray's

application for benefits.  Doc. 13-4 at 57–70.  In the decision, the ALJ considered

the record and applied the five-part sequential test for disability (*see* 20 C.F.R.

§ 416.920(a); *Winschel*, 631 F.3d at 1178).  The ALJ found that Murray had severe

impairments of fibromyalgia, depression, obesity, degenerative joint disease of the

right shoulder, anxiety, diabetes mellitus, and polyneuropathy.  Doc. 13-4 at 61–62.

However, the ALJ found that Murray had a residual functional capacity (RFC) that

allowed for sedentary work with additional limitations, such that Murray could

perform jobs that existed in significant numbers in the national economy and was

not disabled.  Doc. 13-4 at 64–70.  In reaching that decision, the ALJ considered the

opinion of Dr. Russell and gave it great weight, but did not clearly address Dr.

Russell's assertions that Murray had some difficulty reaching and sitting—which

conflicted with the ALJ's RFC determination.  Doc. 13-4 at 67.

### 4.   2019 Appeals Council remand

Murray requested review by the SSA Appeals Council of the ALJ's denial of benefits.  Doc. 13-5 at 66.  On November 14, 2019, the Appeals Council remanded Murray's case to the ALJ for further consideration.  Doc. 13-4 at 75–79.  The Appeals Council found that the ALJ had not adequately addressed Dr. Russell's medical source statement about Murray's limitations in reaching and sitting, which conflicted with the ALJ's stated RFC.  Doc. 13-4 at 77–78.

### 5.   2020 ALJ hearing

On May 8, 2020, the ALJ conducted a second hearing by telephone to determine whether Murray was disabled.  Doc. 13-3 at 36–38.

Murray testified that, during the relevant period in 2016 and 2017, he lived with his wife.  Doc. 13-3 at 41.  Murray testified that the main symptoms that affected him from October 2016 to March 2017 were conditions like fibromyalgia attacks that caused sudden numbness and that were exacerbated by panic attacks caused by stress, as well as pain that affected his concentration.  Doc. 13-3 at 43–44.  Murray stated that his back, shoulders, hands, and "most of the major upper body trigger points that they [use to] classify fibromyalgia" were affected the worst and most often.  Doc. 13-3 at 44.

Murray testified that he had difficulties with his right shoulder (Murray is right-handed), such that he had a hard time holding objects and sometimes would

"drop stuff out of the blue."  Doc. 13-3 at 44–45.  Murray testified that he had been declared eligible to "draw 100 percent VA benefits based on unemployability."  Doc. 13-3 at 45.  Murray testified that he experienced anxiety and "fibro fog" that made it hard to concentrate and articulate thoughts.  Doc. 13-3 at 46.  Murray testified that his anxiety was so bad that there were "a couple of times" when he would have panic attacks while grocery shopping at Walmart with his wife.  Doc. 13-3 at 47.

Murray also testified that he suffered from depression that made it so that he did not "want to do anything," despite the fact that he was previously a very active person.  Doc. 13-3 at 47–48.  Murray testified that he suffered from arthritis that had worsened since 2016.  Doc. 13-3 at 49.  Murray stated that the range of motion in his right shoulder was only 25 or 30 degrees, so that it was difficult to reach up and grab objects, and that his left shoulder was starting to show similar symptoms.  Doc. 13-3 at 49.  He stated that the arthritis in his shoulders was so severe that, in 2020, it caused him to have to stay in bed.  Doc. 13-3 at 49–50.

Murray testified that he had not been associated with the Boy Scouts since about 2019 because of his medical problems, but that he previously worked with them at the suggestion of his psychologist Dr. Moore, and that when he had been working with the Boy Scouts it was "pretty much as a supervisor . . . to make sure everybody[] [was] safe."  Doc. 13-3 at 51.

A vocational expert (or "VE"), Marvin Bryant, testified that a hypothetical

individual with Murray's age and education, work experience, and limitations could not perform his past work, but could perform jobs that existed in significant numbers in the national economy, including surveillance system monitor, lens inserter, and final assembler.  Doc. 13-3 at 54–63.  In response to questioning from the ALJ, VE Bryant stated that those jobs would be available even if the hypothetical individual needed to sit, stand, or otherwise change positions every 30 minutes while remaining at his workstation.  Doc. 13-3 at 63.  The vocational expert testified that being off task for more than 8% of the day on a consistent basis or missing 2 or more days of work per month on a regular basis would be work preclusive.  Doc. 13-3 at 63.  Bryant stated that an individual who could only occasionally handle, finger, and feel bilaterally could not work as a lens inserter or final assembler, but could still work as a surveillance system monitor.  Doc. 13-3 at 66.

### 6.    2020 ALJ decision

On June 10, 2020, the ALJ entered an unfavorable decision.  Doc. 13-3 at 13–29.  In the decision, the ALJ specifically set forth the instructions of the SSA Appeals Council on remand.  Doc. 13-3 at 16–17.  The ALJ noted that Murray had amended his alleged onset date to October 18, 2016.  Doc. 13-3 at 17.

In the decision, the ALJ found that Murray met the requirements for insured status through March 31, 2017.  Doc. 13-3 at 17.  "After careful consideration of all the evidence," the ALJ concluded that Murray "was not under a disability within the

meaning of the Social Security Act from October 18, 2016, through the date last insured." Doc. 13-3 at 17.

The ALJ applied the five-part sequential test for disability (*see* 20 C.F.R. § 404.1520(a); *Winschel*, 631 F.3d at 1178). Doc. 13-3 at 17–19. The ALJ found that Murray was insured through March 31, 2017, that he had not engaged in substantial gainful activity since the alleged onset date of October 18, 2016, and that Murray had severe impairments of "fibromyalgia, depression, anxiety, obesity, degenerative joint disease and impingement syndrome in right shoulder, patellofemoral syndrome, and attention deficit hyperactivity disorder (ADHD)." Doc. 13-3 at 19. The ALJ also found that Murray had nonsevere impairments of acid reflux and tinnitus. Doc. 13-3 at 19. The ALJ determined that Murray did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the applicable Social Security regulations. Doc. 13-3 at 19–20.

The ALJ determined Murray's RFC, finding that Murray could "perform sedentary work," except that he could only occasionally climb ramps or stairs, could never climb ladders, ropes, or scaffolding, could occasionally balance, stoop, kneel, crouch, or crawl, could never reach overhead with the right upper extremity, could frequently reach overhead with the left upper extremity, could have only occasional exposure to extreme conditions, would need a work environment with no more than

moderate noise, and could have no exposure to unprotected heights or hazardous machinery.  Doc. 13-3 at 21.  The ALJ determined that Murray was able to understand, remember, and carry out simple instructions, have "occasional contact with the general public," and adapt to infrequent gradual changes in the work environment. Doc. 13-3 at 21.  The ALJ stated that he had considered all of Murray's symptoms and the extent to which they reasonably could be accepted as consistent with the evidence.  Doc. 13-3 at 21.  The ALJ also stated that he had considered medical opinions and prior administrative medical findings.  Doc. 13-3 at 21.

In assessing Murray's RFC and the extent to which his symptoms limited his function, the ALJ stated that he "must follow" the required "two-step process": (1) "determine[] whether there is an underlying medically determinable physical or mental impairment[] . . . that could reasonably be expected to produce the claimant's pain or other symptoms"; and (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional limitations."  Doc. 13-3 at 21.

The ALJ then provided a summary of Murray's testimony about his physical and psychological symptoms, limitations, and activities.  Doc. 13-3 at 22.  The ALJ also provided a summary of Murray's medical records, and stated that the medical records confirmed "a history of treatment for fibromyalgia, degenerative joint disease and impingement syndrome in the right shoulder, and patellofemoral

syndrome in the context of obesity," as well as "a history of mental health treatment for depression, anxiety, and ADHD."  Doc. 13-3 at 22–24.

Based on "careful consideration of the evidence," the ALJ found that Murray's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms," but that Murray's "statements concerning the intensity, persistence, and limiting effects" of his symptoms "are not entirely consistent with the medical evidence and other evidence in the record."  Doc. 13-3 at 24.  The ALJ found that medical treatment records did not "provide objective support" for Murray's allegations of disabling pain and limitations caused by his physical impairments, "even when considered alongside his obesity as required by SSR [Social Security Ruling] 19-2p."  Doc. 13-3 at 24.  The ALJ found that Murray displayed limited range of motion in his right shoulder, and to a lesser extent his left shoulder, but that Murray acknowledged that he still could raise his arm over his head when he dressed.  Doc. 13-3 at 24.  The ALJ also found that Murray complained of pain, tenderness, and hypersensitivity in his abdomen and arms, but that he retained full motor strength, grip strength, and normal fine and gross manipulation during the relevant time period.  Doc. 13-3 at 24.  The ALJ found that there was no evidence of a fibromyalgia flare-up during the relevant time period, and that there was no evidence of brain fog because Murray "consistently presented as alert and fully oriented, maintaining normal cognition and memory."  Doc. 13-3 at 24.  The

ALJ also found that, despite alleged pain and obesity, Murray "maintained a normal gait with no evidence of imbalance, incoordination, or instability."  Doc. 13-3 at 24.

The ALJ found that Murray's "mental impairments also generally remained stable during the period at issue."  Doc. 13-3 at 24.  The ALJ found that Murray "primarily discussed his situational stressors and did not endorse any disabling psychological symptoms," and that his mental health status findings were unremarkable aside from depressed mood and fair/good insight, judgment, concentration, and attention.  Doc. 13-3 at 24.  The ALJ also found that Murray "remained busy during the relevant period," including volunteering with the Boy Scouts, involvement in faith and community groups, and web design, and that there was no evidence of any worsening of Murray's mental impairment in the record. Doc. 13-3 at 24.

The ALJ found that, although Murray was "not disabled, he did have some restrictions associated with his impairments."  Doc. 13-3 at 25.  The ALJ found that, based on the combination of Murray's impairments, he could only perform sedentary work with further limitations to accommodate his fibromyalgia, knee and shoulder impairments, obesity, decreased reaction time due to pain or brain fog, impaired hearing, and anxiety.  Doc. 13-3 at 25.

The ALJ gave little weight to the opinion of the non-examining state agency psychiatrist who found Murray's mental impairments nonsevere, finding that

Murray did have severe impairments, even if they were not disabling.  Doc. 13-3 at 25.  The ALJ gave some weight to the opinion of the non-examining state agency physician who provided an opinion on Murray's physical restrictions, but found that sedentary work rather than light work was more consistent with the evidence.  Doc. 13-3 at 25.

Consistent with the remand from the Appeals Council, the ALJ stated that the opinion of examining physician Dr. Dallas Russell was "generally given great weight," but found that Dr. Russell's opinion did not give "any specific function-by-function opinions about the claimant's physical abilities" and did not quantify or explain Dr. Russell's opinion statements, which reduced the helpfulness of the opinion.  Doc. 13-3 at 25.  The ALJ found that Dr. Russell's opinions that Murray would have difficulty with sitting and humidity were not supported by Dr. Russell's objective findings or treatment records, and that Dr. Russell's opinion that Murray's ability to reach forward would be "abnormal" did not provide a "firm opinion about that activity."  Doc. 13-3 at 25.  Otherwise, the ALJ found that Dr. Russell's opinion was consistent with the record, and the limitations that Dr. Russell assessed were accommodated by the ALJ's RFC finding.  Doc. 13-3 at 25–26.

The ALJ gave the opinion of treating psychologist Dr. Lindsey Moore little weight, finding that Dr. Moore "offered her opinions in July 2018, well after the claimant's insured status expired," and that Dr. Moore's opinions were "contradicted

by her own treatment records covering the period at issue." Doc. 13-3 at 26.  The ALJ found that Dr. Moore's examinations showed only mild mood abnormalities with otherwise normal findings and no evidence of severe symptoms or poor mental functioning.  Doc. 13-3 at 26.

The ALJ found that, "[i]n sum, when fully considering [Murray's] subjective allegations in light of daily activities, admitted abilities, opinion evidence, clinical findings, and course of treatment," Murray could "successfully perform work activity" on a sustained basis within the parameters of the ALJ's RFC finding.  Doc. 13-3 at 26.

The ALJ found that Murray could not perform his past relevant work and that, based on the vocational expert's testimony and considering Murray's age, education, work experience, and RFC, there existed jobs in significant numbers in the national economy that Murray could perform, including security system monitor, lens inserter, and final assembler.  Doc. 13-3 at 27–28.  Accordingly, the ALJ found that Murray had not been disabled under the Social Security Act through March 31, 2017 (the last date insured).  Doc. 13-3 at 29.

### 7.    2021 Appeals Council decision

Murray sought review from the SSA Appeals Council of the ALJ's denial of benefits.  Doc. 13-3 at 2; Doc. 13-6 at 2–3.  On January 11, 2021, the Appeals Council denied the request for review, finding no reason to review the ALJ's

decision.  Doc. 13-3 at 2.  Because the Appeals Council found no reason to review the ALJ's opinion, the ALJ's decision became the final decision of the Commissioner.

## DISCUSSION

Having carefully considered the record and briefing, the court concludes that the ALJ's decision was supported by substantial evidence and based on proper legal standards.

I.   **The ALJ evaluated the opinion of consultative physician Dr. Dallas Russell according to the proper legal standards, and substantial evidence supported the ALJ's finding regarding Dr. Russell's opinion that Plaintiff Murray would have difficulty sitting.**

The ALJ evaluated the opinion of consultative physician Dr. Dallas Russell according to the proper legal standards, and the ALJ's finding regarding Dr. Russell's opinion that Plaintiff Murray would have difficulty sitting was supported by substantial evidence.  In his briefing, Murray argues that substantial evidence does not support the ALJ's rejection of Dr. Russell's opinion that Murray would have "difficulty sitting," and that the ALJ rejected the opinion without adequate explanation.  Doc. 19 at 8–10.

As an initial matter, because Dr. Russell was a consultative physician who only saw Murray once, the ALJ was not required to assess Dr. Russell's opinion according to the so-called "treating physician rule."  *See infra* Part II.

Under that general rule, the opinions of treating physicians are given "more

32

weight" than the opinion of a non-treating physician "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).

A physician "who examines a claimant on only one occasion is not considered a treating physician,'" and that physician's opinion is not presumed to merit great weight. *Crawford*, 363 F.3d at 1160 (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987)).

However, an ALJ still "must explicitly consider and explain the weight accorded to the medical opinion evidence," even if the opinion does not come from a treating physician. *Winschel*, 631 F.3d at 1179.

Here, Dr. Russell stated after his consultative examination that Murray had mostly normal range of motion, except for reduced flexion and extension in his dorsolumbar spine and some reduced range of motion in his knees and shoulders. Doc. 13-12 at 181–82. Dr. Russell stated that Murray's fibromyalgia was his biggest issue and affected his shoulders, arms, neck, and chest regions, and "the legs to some degree," and could sometimes leave him "almost bed-bound."  Doc. 13-12 at 183. Dr. Russell observed that Murray had tender points that caused pain, and that he had

lower back pain that caused him to have to "shift positions with sitting." Doc. 13-12 at 183. Dr. Russell noted "left knee difficulties" and pain, as well as chest pain. Doc. 13-12 at 183–84. Dr. Russell opined that Murray avoided lifting, had difficulties walking, could have trouble standing for long periods of time, and had to shift positions when sitting. Doc. 13-12 at 184. Dr. Russell also opined that Murray would have "difficulty" with carrying and lifting and pushing and pulling, and that "there is difficulty" with sitting, standing, and walking. Doc. 13-12 at 186.

The ALJ "generally" gave Dr. Russell's opinion "great weight," but found that Dr. Russell "did not give specific function-by-function opinions about [Murray's] physical abilities" and did not "quantify[] the level of difficulty or offer[] any explanations for [the opinion] statements, which render[ed] [the] opinions less helpful." Doc. 13-3 at 25. The ALJ found that Dr. Russell "merely noted areas in which [Murray] may have difficulty." Doc. 13-3 at 25. The ALJ found that Dr. Russell's opinion generally was consistent with the record, and the ALJ's RFC (residual functional capacity) finding accommodated Murray's limitations as expressed by Dr. Russell. Doc. 13-3 at 25–26.

The only parts of Dr. Russell's opinion that the ALJ did not give great weight were Dr. Russell's statements that Murray would have difficulty with sitting and humidity, and that Murray's reach was abnormal. Doc. 13-3 at 25.

In particular, with respect to Dr. Russell's statement that Murray "would have

difficulty sitting," the ALJ found that the opinion "[was] not supported by any of [Dr. Russell's] objective findings or any findings in the treatment records."  Doc. 13-3 at 25.

Thus, the ALJ evaluated the Dr. Russell's opinion according to the proper legal standards.  Because the "treating physician rule" did not apply, the ALJ was not required to give Dr. Russell's opinion considerable weight—though the ALJ generally did give Dr. Russell's opinion "great weight" anyway.  Doc. 13-3 at 25. And, the ALJ "explicitly consider[ed] and explain[ed] the weight" that the ALJ "accorded to the medical opinion evidence" from Dr. Russell (*Winschel*, 631 F.3d at 1179), including Dr. Russell's opinion statement that Murray would have difficulty sitting.

In addition, substantial evidence supported the ALJ's evaluation of Dr. Russell's opinion, including the ALJ's finding regarding Dr. Russell's opinion that Murray would have difficulty sitting.  *First* (as discussed above), the ALJ generally gave Dr. Russell's opinions "great weight" and factored the limitations expressed by Dr. Russell into the finding regarding Murray's RFC.  *See* Doc. 13-3 at 25–26.

*Second*, the ALJ specifically found that the helpfulness of Dr. Russell's opinion was reduced by the reality that Dr. Russell did not provide specific functional opinions or explanations.  Doc. 13-3 at 25.  That lack of functional specifics and explanations is clear in Dr. Russell's opinion that Murray would have

"difficulty with sitting"; Dr. Russell stated that Murray had pain and would need to shift positions while sitting, but otherwise provided no explanation of what "difficulty with sitting" might entail or how it might affect or limit Murray's functional ability to perform sedentary work.  Doc. 13-12 at 183–86.

*Third*, the ALJ specifically found that Dr. Russell's opinion regarding Murray's "difficulty" sitting was not supported by Dr. Russell's objective findings or any findings in Murray's treatment records (Doc. 13-3 at 25), and substantial evidence supported that finding.  Dr. Russell observed that Murray had some reduced range of motion in his spine, but gave no indication that the reduction was such that it significantly affected Murray's ability to sit.  Doc. 13-12 at 183. Likewise, Dr. Russell noted that Murray had pain and tender points, but did not identify any clear connection between those findings and Murray's ability to sit. Doc. 13-12 at 183–84.  In short, none of Dr. Russell's objective findings indicates an evident connection to Murray's ability to sit.  On multiple occasions, Dr. Russell also noted that Murray had to shift positions when sitting, which presupposes Murray's ability to sit and undermines any assertion of difficulty sitting that would rise to the level of disability or render Murray incapable of performing sedentary work.  Doc. 13-12 at 183–84.

Furthermore, Murray's other medical records show the presence of pain and fibromyalgia, but do not indicate any restriction in his ability to sit.  In fact, on

multiple occasions Murray was encouraged to do activities that required more exertion than sitting, like exercise and tai chi. *See, e.g.*, Doc. 13-9 at 77; Doc. 13-15 at 78. Murray's own testimony also showed that he could drive or ride in a car while seated, and he did not provide material testimonial evidence that he had significant trouble with sitting. Doc. 13-3 at 75; Doc. 13-8 at 27. Plus, Murray routinely engaged in sedentary activities like watching television or playing video games. Doc. 13-8 at 24.

In addition, the ALJ questioned the vocational expert at Murray's second hearing about a limitation for needing to change positions every 30 minutes. Doc. 13-3 at 63. The vocational expert confirmed that the jobs that existed in the national economy would accommodate the need to change positions. Doc. 13-3 at 63. Thus, despite finding that Dr. Russell's opinion about "difficulty" sitting was not supported by the record, and was inconsistent with the record,[1] the ALJ still considered Dr. Russell's observation about Murray's shifting positions while sitting.

*Fourth* (and finally), the ALJ's evaluation of Dr. Russell's opinion did not "violate[] the spirit" (or the letter) of the Appeals Council's "mandate." Doc. 19 at 10 n.1. In its remand order, the Appeals Council directed the ALJ to evaluate Dr. Russell's opinion and to explain the weight given to that opinion. *See* Doc. 13-3 at

---

[1] Supportability and consistency are among the factors considered in determining the weight to give a medical opinion. 20 C.F.R. 404.1527(c).

16.   As discussed above, the ALJ's decision explicitly evaluated Dr. Russell's opinion, and found that Dr. Russell's opinion statement about Murray's difficulty sitting was not supported by objective findings or by the evidence in the treatment records.  Doc. 13-3 at 25.  And, on Murray's subsequent request for review, the Appeals Council found no reason to review the ALJ's decision.  Doc. 13-2 at 2. Thus, the ALJ did comply with the Appeals Council's "mandate" to evaluate Dr. Russell's medical source statement about difficulty sitting (and about abnormal reaching, *see* Doc. 13-3 at 25).  Indeed, the ALJ's finding that Dr. Russell's opinion statement about Murray's difficulty sitting was not supported by the record eliminated the apparent conflict between Dr. Russell's opinion and Murray's RFC that the Appeals Council previously had identified as requiring remand (*see* Doc. 13-4 at 77–78).  And the ALJ's RFC finding that Murray could perform less than a full range of sedentary work included accommodations for Murray's limitations that were supported by the evidence.

In sum, the ALJ's decision demonstrates that the ALJ considered and explained the ALJ's evaluation of Dr. Russell's opinion, including the ALJ's finding regarding Dr. Russell's opinion that Murray would have difficulty sitting.  *See Winschel*, 631 F.3d at 1179.  Dr. Russell was not a "treating physician" whose opinion would have been given deference, and the ALJ generally gave Dr. Russell's opinion great weight anyway.  *See Crawford*, 363 F.3d at 1160.  And, because the

record contains sufficient relevant evidence that a reasonable person would accept as adequate to support the ALJ's evaluation of Dr. Russell's opinion, substantial evidence supported the ALJ's decision.  *See id.* at 1158.

## II. The ALJ evaluated the opinion of treating psychologist Dr. Lindsey Moore according to the proper legal standards, and substantial evidence supported the ALJ's decision to give Dr. Moore's opinion little weight.

The ALJ evaluated the opinion of treating psychologist Dr. Lindsey Moore according to the proper legal standards, and the ALJ's decision to give Dr. Moore's opinion little weight was supported by substantial evidence.  In his briefing, Murray argues that substantial evidence does not support the ALJ's decision to disregard Dr. Moore's opinion, because the ALJ inaccurately stated that the opinion was given after the relevant time period and because Dr. Moore's opinion was consistent with the record.  Doc. 19 at 10–14.

With respect to the controlling legal standard, and for a disability application filed before March 27, 2017 (like the application in this case), an ALJ is required to give the opinion of a claimant's treating physician "substantial or considerable weight unless 'good cause' is shown to the contrary."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quotation marks and citation omitted).

There is "good cause" to discount a treating physician's opinion under the following circumstances:  (1) the "treating physician's opinion was not bolstered by the evidence"; (2) the "evidence supported a contrary finding"; or (3) the "treating

physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F.3d at 1179 (quotation marks omitted).[2]

Likewise, under the Social Security regulation for a disability application filed before March 27, 2017, if "a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," then that opinion "will [be given] controlling weight." 20 C.F.R. § 404.1527(c)(2).

Furthermore, a "statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the SSA] will determine" that the claimant is "disabled." 20 C.F.R. § 404.1527(d)(1). That is because opinions about whether a claimant is disabled, the claimant's RFC, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Any such

---

[2] Revised Social Security regulations—which were published on January 18, 2017, and which became effective on March 27, 2017—eliminated this so-called "treating physician rule." *See* 20 C.F.R. § 404.1520c (2017) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."); *Harner v. Social Sec. Admin., Comm'r*, 38 F.4th 892, 897–98 (11th Cir. 2022) (holding that 20 C.F.R. § 404.1520c, which prohibits deferring to any medical opinions, applies to claims filed after March 27, 2017, and eliminates the treating physician rule). But, because Murray filed his application in September 2016 (i.e., before the effective date of those new regulations), the court applies the Eleventh Circuit's treating physician rule. *See* Doc. 10-5 at 40.

statement from a treating physician may be relevant to the ALJ's findings but is not determinative, because it is the ALJ who must assess the claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1546(c). And the court analyzes only whether the ALJ's RFC determination was supported by substantial evidence; the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer*, 395 F.3d at 1210.

Here, Dr. Moore made two identical statements offering opinions—the first on May 9, 2016, and the second on June 25, 2018. Doc. 13-9 at 160; Doc. 13-16 at 79. Dr. Moore stated that Murray suffered from anxiety disorder and ADHD, such that he experienced "marked interference" with many mental processes. Doc. 13-9 at 160; Doc. 13-16 at 79. Dr. Moore also noted that Murray suffered from fibromyalgia, which had a cyclical relationship with his anxiety and depression, such that they could all combine to the point that "Mr. Murray may experience diminished ability to perform typical duties and responsibilities associated with traditional employment." Doc. 13-9 at 160; Doc. 13-16 at 79. Dr. Moore also stated that, despite treatment, Murray had not experienced "much improvement in his overall mental health status." Doc. 13-9 at 160.

In deciding to give Dr. Moore's opinion little weight, the ALJ relied on several findings. The ALJ did note that Dr. Moore "offered her opinions in July 2018, well after the claimant's insured status expired." Doc. 13-3 at 26. But then, with respect

to the relevant time period, the ALJ found that Dr. Moore's opinions "are also contradicted by her own treatment records *covering the period at issue*."  Doc. 13-3 at 26 (emphasis added).  The ALJ found that, "[a]t worst," Dr. Moore's "mental status findings show only some mild mood abnormalities with fair insight, judgment, attention, and concentration at times," but that Dr. Moore's "findings otherwise remained normal with no evidence of any severe symptoms or poor levels of mental functioning."  Doc. 13-3 at 26.

The ALJ also found that, "at two mental health visits in March 2017, the month [Murray's] insured status expired, [Murray] stated that he was doing 'fine' and acknowledged improvement in his mood."  Doc. 13-3 at 26.

The ALJ found that, "[a]lthough [Murray] alleges that he cannot return to his past skilled computer work because of word-finding difficulties and difficulty thinking clearly, there is nothing in the record to indicate that he could not perform a range of simple work as described in the residual functional capacity."  Doc. 13-3 at 26.

The ALJ found further that Murray had "testified that Dr. Moore suggested he become involved in the community, which is how he got involved with Boy Scouts," and that, "[a]lthough he testified that he is no longer involved with them, he stated that he was still volunteering with that organization before the date last insured."  Doc. 13-3 at 26.

In this regard, the ALJ identified good cause for giving Dr. Moore's opinions little weight (*see Phillips*, 357 F.3d at 1240), and substantial evidence supported the ALJ's findings.  Dr. Moore's opinion was inconsistent with her own medical records and was not bolstered by the evidence, and the evidence supported a contrary finding.  *Winschel*, 631 F.3d at 1179.

As a preliminary matter, while Murray argues that the ALJ erred in evaluating Dr. Moore's opinions because the ALJ said that the opinion was offered after the last insured date (*see* Doc. 19 at 11), any error was harmless.  As discussed above, the ALJ was correct that one of Dr. Moore's opinions was offered in June 2018, which was after Murray's last insured date.  *See* Doc. 13-3 at 17.  Dr. Moore also submitted an identical opinion on May 9, 2016 (Doc. 13-9 at 160), which was before Murray's alleged onset date, but that does not change the fact that Dr. Moore's second opinion was issued after the relevant time period.  More importantly (and as also discussed above), the ALJ's decision included several findings based on which the ALJ found good cause to give little weight to Dr. Moore's opinion.  Regardless of the dates of Dr. Moore's opinions, the ALJ's findings regarding those verbatim opinions addressed the relevant time period.  Among other things, the ALJ found that Dr. Moore's opinions were "contradicted by her own treatment records covering the period at issue."  Doc. 13-3 at 26.

Substantial record evidence supported the ALJ's finding that Dr. Moore's

opinion was inconsistent with her treatment records, which provides good cause to give that opinion little weight. *Winschel*, 631 F.3d at 1179. While Dr. Moore stated that Murray's conditions created "marked interference" with some of his mental processes and might cause Murray to "experience diminished ability to perform typical duties and responsibilities associated with traditional employment" (Doc. 13-9 at 160; Doc. 13-16 at 79), the records from Dr. Moore's sessions with Murray support the ALJ's finding that nothing indicated that Murray could not perform simple work.

Like Dr. Russell's opinion (*see supra* Part I), Dr. Moore's opinion generally did not provide specific function-by-function limitations or explanations. Instead, Dr. Moore simply stated that Murray's ability to perform "typical duties and responsibilities" associated with "traditional employment" would be "diminished." Doc. 13-9 at 160; Doc. 13-16 at 79. Even that opinion statement is sufficiently conclusory and vague that, as the ALJ found, it does not show that Murray could not perform simple, limited work as stated in the ALJ's RFC finding. *See* Doc. 13-3 at 26.

Furthermore, the record evidence shows that, over the course of his sessions with Dr. Moore, Murray was consistently alert, oriented, and engaged, presented normally with good hygiene, dress, and eye contact, and had normal thought processes and speech. *See*, *e.g.*, Doc. 13-9 at 123, 140, 149, 153, 157, 162, 175, 181,

44

185, 189, 196, 222; Doc. 13-10 at 31, 84, 98, 123, 130, 137; Doc. 13-12 at 125, 153; Doc. 13-13 at 58, 79, 84, 92, 192–93; Doc. 13-14 at 16, 22, 46, 55; Doc. 13-15 at 123–24, 144, 152–53, 177.   Murray often was distressed by external stressors rather than severe pathology and was able to participate in social or intellectual activities that he enjoyed, like the Boy Scouts, the Masons, and web design.  *See*, *e.g.*, Doc. 13-9 at 124, 141, 150, 154, 158, 163, 176, 182, 186, 190, 197, 223; Doc. 13-10 at 31, 84, 99, 124, 131, 138; Doc. 13-12 at 126, 154; Doc. 13-13 at 58, 79, 85, 93–94, 193–94; Doc. 13-14 at 17, 23, 47, 56; Doc. 13-15 at 125, 154, 178.   Throughout Murray's sessions, Dr. Moore continued with conservative treatment plans and did not note symptoms requiring urgent intervention.  *See*, *e.g.*, Doc. 13-9 at 125, 142, 151, 155, 159, 177, 183, 187, 191, 198, 224; Doc. 13-10 at 32, 85, 100, 125, 132, 139; Doc. 13-12 at 155; Doc. 13-15 at 126, 145–46; Doc. 13-16 at 70.   Murray's general ability to present normally, his desire and ability to be involved in the activities that he enjoyed, and his lack of symptoms requiring urgent intervention all support the ALJ's finding that Dr. Moore's records were not consistent with an inability to work.

Additionally, the medical evidence in the record shows that Murray had improved during the relevant time period.  In March 2015, he reported to Dr. Khan that he felt "stressed out" (Doc. 13-10 at 102), but subsequently he tended to be "doing good," stable, or "doing okay," and was helped by medication (Doc. 13-9 at

45

225; Doc. 13-10 at 79; Doc. 13-13 at 54, 87, 198; Doc. 13-15 at 148).  Murray also reported in March 2017 at a psychiatric visit that he was "fine," despite stressful situations in his life.  Doc. 13-14 at 49–50.  Further, in his own testimony, Murray stated that his treatment with Dr. Moore was "mostly stress management."  Doc. 13-3 at 77.  He also confirmed that, at the relevant time, he volunteered with the Boy Scouts and was active in the Masons.  Doc. 13-3 at 81, 91–92.  This testimony supports the ALJ's finding that the severity of Murray's limitations was not such that he was disabled, even if he would not have been able to perform his previous work.

A review of the record shows sufficient evidence that a reasonable person would accept as adequate to support the ALJ's findings that Dr. Moore's opinion was not bolstered by the evidence and was inconsistent with her own records, and that the evidence supported a contrary finding; consequently, good cause supported the ALJ's decision to give Dr. Moore's opinion little weight.  *See Winschel*, 631 F.3d at 1179; *Phillips*, 357 F.3d at 1240; 20 C.F.R. § 404.1527(c)(2).  Thus, substantial evidence supported that ALJ's decision.  *See Crawford*, 363 F.3d at 1158.

## CONCLUSION

For the reasons stated above (and pursuant to 42 U.S.C. § 405(g)), the court **AFFIRMS** the Commissioner's decision.  The court separately will enter final

judgment.

       **DONE** and **ORDERED** this September 26, 2022.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE